IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID ROSARIO, | ) |
| Plaintiff, | ) Civil Action No. 2:23-cv-966 |
| v. | ) Magistrate Judge Patricia L. Dodge |
| FORMER SECRETARY JOHN WETZEL, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**[1]

David Rosario ("Rosario"), a convicted and sentenced state prisoner, brings this pro se civil rights action against various individuals associated with the Pennsylvania Department of Corrections ("DOC"). Rosario's claims relate to his housing status and placement on the Restricted Release List ("RRL").

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 77). For the following reasons, the motion will be granted.

I.   **Relevant Procedural History**

Rosario commenced the underlying action in June 2023. (ECF No. 1.) His Amended Complaint, filed on September 1, 2023, initially asserted claims under the Eighth and Fourteenth Amendments, Americans with Disabilities Act ("ADA"), negligence, conspiracy, and IIED against John Wetzel, Dr. Laurel Harry, Tammy Ferguson, Tabb Bickle, Brian Schneider, Director Benning (collectively "Defendants"), and Dr. Andrew Newton ("Dr. Newton"). (ECF No. 18.)

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. The undersigned therefore has the authority to decide dispositive motions and enter final judgment.

According to the Amended Complaint, Rosario has an extensive history of mental illness and had previously been diagnosed with bi-polar disorder, anxiety disorder, manic depressive disorder, and schizophrenia. (*Id.* ¶ 34.) At some point, the DOC recognized him as having a Serious Mental Illness ("SMI")[2] and he was given a stability code "D" designation.[3] (*Id.* ¶ 35.) In January 2020 while incarcerated at SCI Mahoney, Rosario alleges that his psychiatric medications were abruptly discontinued and he was moved from a specialized mental health housing unit to general population. (*Id.* ¶¶ 37-38.) Shortly after, Rosario "was involved in a physical altercation with a prison official[.]" (*Id.* ¶ 39.) He alleges that DOC personnel intentionally manipulated his diagnosis to remove him from the D Roster to facilitate his placement on the RRL as punishment for this altercation.[4] (*Id.* ¶¶ 44-50.)

Defendants moved to partially dismiss the Amended Complaint. (ECF No. 19.) Rather than oppose the motion, Rosario requested dismissal of Counts V (negligence), VI (conspiracy), and VII (IIED). (ECF No. 31.) Dr. Newton filed a separate motion to dismiss. (ECF No. 25.) Similarly, Rosario's response requested that Dr. Newton be voluntarily dismissed as a defendant. (ECF No. 30.) Based on Rosario's response, the Court dismissed Counts V, VI, and VII without prejudice; dismissed all claims against Dr. Newton without prejudice; and dismissed both motions to dismiss

---

[2] The DOC defines SMI as "a current diagnosis or a recent significant history of any of the DSM5 diagnoses[.]" (ECF No. 80-3 at 53.)

[3] The DOC uses a roster system to identify and track inmates with mental illness/intellectual disability ("ID"). Under DOC policy, "D Roster" inmates are those currently diagnosed with an SMI, ID, credible functional impairment, or found guilty but mentally ill. (ECF No. 80-3 at 52-53.) An inmate's roster status may be upgraded or downgraded, as appropriate, by the Psychiatric Review Team. (*Id.* at 63-65.)

[4] DOC policy states: "The Department strives to avoid prolonged placement of individuals with a Serious Mental Illness (SMI) and/or Intellectual Disability (ID) in Restrictive Housing or Extended Restrictive Housing." (ECF No. 80-3 at 279.)

2

as moot. (ECF Nos. 32, 33, 34, 33, 35).[5] Defendants answered the four remaining claims on November 30, 2023. (ECF No. 39.)

Count I alleges that the conditions of Rosario's confinement and his indefinite RRL status violate the Eighth Amendment. Count II alleges that Defendants Brian Schneider ("Schneider") and Director Benning ("Benning") were deliberately indifferent to Rosario's medical needs by denying him adequate mental health treatment.[6] In Count III, Rosario alleges that Defendants violated his Fourteenth Amendment due process rights by denying him the opportunity for meaningful review or appeal of his RRL status. Count IV alleges that Defendants violated Title II of the ADA by denying Rosario access to the same types of psychiatric care and rehabilitative programming as other inmates. (ECF No. 18.)

Following the close of discovery, Defendants moved for summary judgment. (ECF No. 77.) The motion has now been fully briefed (ECF Nos. 78, 79, 80, 99, 100, 104, 105) and is ready for disposition.[7]

## II. **Material Facts**

The summary judgment record reflects that on March 24, 2020, Rosario attacked and injured a guard at SCI Mahoney. (ECF No. 80-8.) He was later charged and pleaded guilty to aggravated assault in the Court of Common Pleas of Schuylkill County. (ECF No. 80-1.) The

---

[5] On August 6, 2024, Rosario filed a "Motion to Reinstate Defendant/Claims Prior Dismissed," requesting that he "be granted leave to amend to basically proceed on his original complaint — reflective of defendant Newton and relevant claims against him." (ECF No. 84.) The Court denied the motion. (ECF No. 90.)
[6] Originally Count II also named Dr. Newton as a defendant. *See* ECF Nos. 30, 34.
[7] The Court previously noted apparent differences in the signatures on some of Rosario's filings. (ECF No. 107.) Rosario has since confirmed that these filings originated with him and that they fully and fairly state his position on the relevant matters. (ECF No. 109.)

March 24, 2020 assault prompted DOC personnel to initiate a petition to have Rosario placed on the RRL. (ECF Nos. 79, 104 ¶ 121.)

Immediately after the assault, Rosario was transferred to SCI Camp Hill where he was housed in the Restricted Housing Unit ("RHU") on administrative custody ("AC") status.[8] (ECF Nos. 79, 104 ¶¶ 122-23.) An Extraordinary Occurrence Report generated on February 19, 2021 details a second incident in which Rosario "threw his lunch and an unknown liquid that smelled like urine out of the food panel" towards a corrections officer. (ECF No. 80-10 at 2.) While Rosario denies throwing any substance at DOC personnel (ECF No. 104 ¶¶ 102-5), he did receive an assault misconduct and a disciplinary sanction based on this event. (ECF No. 80-6 at 3.)

On July 9, 2021, Rosario was involved in another incident in which he physically assaulted a guard at SCI Camp Hill. (ECF No. 80-11.) A Cumberland County jury later convicted Rosario of two counts of aggravated assault and he was sentenced to an additional 10 to 20 years' confinement. (ECF No. 80-12) (ECF Nos. 79, 104 ¶ 140.)

Pursuant to DC-ADM 802, an inmate may be designated and reviewed for RRL placement when he/she threatens the secure operation of the facility and transfer to another facility would not alleviate security concerns. (ECF Nos. 79, 104 ¶ 16.) The criteria for RRL placement includes history of assaults against DOC staff or other inmates, perpetuated sexual abuse history, history of escape or attempted escape, and threat to the orderly operation of a facility. (ECF Nos. 79, 104 ¶ 17.) Rosario was officially approved for the RRL on June 16, 2021, "due to his assaultive misconducts that include multiple assaults on staff and multiple assaults on other inmates." (ECF

---

[8] Under DOC policy, an inmate may be placed in AC status if their "presence in general population would constitute a threat to life, property, himself/herself, staff, other inmates, the public, or the secure or orderly running of the facility." (ECF Nos. 79, 104 ¶ 15.)

4

Nos. 79, 104 ¶ 139.)

Since his initial transfer to the RHU in March 2020, Rosario has received a number of additional disciplinary sanctions for upheld misconducts. (*See* ECF No. 80-6.) The summary judgment record contains documents memorializing Rosario's PRC reviews that took place from July 7, 2021 to January 17, 2024. (*See* ECF No. 80-13.) Rosario also admits that he had been participating in a six-tiered Intensive Management Unit ("IMU") program designed to encourage RRL inmates to develop skills that they could use to reintegrate into a general population setting. (ECF Nos. 79, 104 ¶¶ 134-36.)

Included with Rosario's brief are select DOC medical records spanning the period of October 3, 2018 to February 24, 2022. (ECF No. 100-4.) He also attached two of his own unsworn declarations (ECF Nos. 100-3, 100-8), the declaration of a fellow inmate (ECF No. 100-8), and three secondary sources discussing the use of solitary confinement in prisons (ECF Nos. 100-5, 100-6, 100-7),

### III. Legal Standard

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a

genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

**IV.   Discussion**

Rosario's three civil rights claims are asserted under 42 U.S.C. § 1983. Section 1983 does not itself create any substantive rights; it merely serves as a vehicle for a plaintiff to vindicate rights that have already been secured elsewhere. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Rosario's § 1983 claims allege violations of the Eighth and Fourteenth Amendments.

**A. Eighth Amendment claims**

1. Conditions of confinement claim against all Defendants

Rosario alleges that Defendants were deliberately indifferent to the potential for serious harm caused by subjecting him to prolonged solitary confinement. He asserts that Defendants disregarded his health and safety by "collectively promot[ing] the oppressive and harmful use of

long-term RHU-based segregation unit as well as indefinite statuses like RRL." (ECF No. 18 ¶ 60.) Defendants argue that they are entitled to summary judgment because Rosario alleges no deprivation beyond his mere placement on the RRL. (ECF No. 78 at 6-7.)

The Eighth Amendment prohibits cruel and unusual punishment that "violates civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). Prison conditions are cruel and unusual if they deprive inmates of basic human needs, such as food, sanitation, and medical care. *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981). The Eighth Amendment does not, however, require that prisons be comfortable. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (citing *Rhodes*, 452 U.S. at 349).

To successfully establish an Eighth Amendment violation, plaintiffs must make both an objective and subjective showing. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective prong, the prisoner "must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Mammana*, 934 F.3d at 373 (quoting *Farmer*, 511 U.S. at 834). The deprivation alleged must be "objectively, sufficiently serious" so as to have resulted in the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) and *Rhodes*, 452 U.S. at 347)). A prisoner must then show that the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 229 (3d Cir. 2015) (quoting *Farmer*, 511 U.S. at 847). The prisoner "may demonstrate deliberate indifference by showing that the risk of harm was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past such that the defendants must have known about the risk." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 259 (3d Cir. 2010)

7

(quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted).

Defendants argue that Rosario's claim fails both prongs of the analysis. They contend that the summary judgement record contains no evidence that Rosario's confinement in the RHU or placement on the RRL rises to the level of an "objectively, sufficiently serious" condition. They maintain that Rosario merely challenges his RRL placement generally, which they argue is an insufficient basis for his Eighth Amendment claim. (ECF No. 78 at 8-9.) *See Bowen v. Ryan*, 248 F. App'x 302, 304 (3d Cir. 2007) (finding DOC procedures for RRL placement constitutional); *Blount v. Unit Manager Ackrom*, 2024 U.S. Dist. LEXIS 98766, at *15 (W.D. Pa. Jun. 4, 2024) (noting *Bowen* forecloses plaintiff from facially challenging RRL procedures).

Rosario maintains that the length of time he spent in solitary confinement under harsh conditions combined with the indefinite nature of his RRL status rises to the level of cruel and unusual punishment. (ECF No. 100 at 8-9.) Rosario was put on AC status beginning March 24, 2020, and was officially approved for the RRL on June 16, 2021. Thus, by the time he had filed his original complaint in September 2023, he had spent over 41 months in the RHU and more than 26 months on the RRL. During this time, he alleges a number of restrictive conditions, including limited contact with loved ones and other inmates; inability to get married; ineligibility for DOC educational and vocational programs; limited exercise; limited showers and access to hygiene products; inadequate mental health care; and limited access to personal legal material. (ECF No. 18 ¶ 27.) His brief also cites several secondary sources that discuss the negative impact of solitary confinement on inmates. (ECF No. 100 at 10.)

Defendants argue, however, that Rosario was participating in SCI Phoenix's IMU program. At the time of briefing, Rosario was a Phase 3 participant, affording him additional privileges, including phone calls, video visits, group treatment, out-of-cell meals, and individual counseling. (ECF Nos. 79, 104 ¶¶ 145-47.) While Rosario admits that he was a Phase 3 IMU participant, he argues that the privileges cited by Defendants "are often left up to the discretion of staff" and are therefore not mandatory. (ECF No. 100 at 10.) He maintains that individual counseling was "almost never conducted, groups almost never ran and IMU participants [were] not being allowed to congregate [or] <u>exercise</u> period in no phase [sic]." (ECF No. 104 ¶ 147) (emphasis in original). He also offers his own unsworn declaration and the declaration of a fellow inmate in support of his position that IMU participants were not consistently receiving privileges associated with each phase of the program. (*See* ECF No. 100-8.)

But even accepting Rosario's account as true, he has nevertheless failed to show that he was denied "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. "Prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* at 832. There is no evidence of record suggesting that Rosario was denied basic necessities such as food or water or that he was housed in a cell that had persistent unsanitary or unsafe conditions. Although he does attack the discretionary nature of the IMU privileges, his ongoing participation nonetheless made him eligible to be housed under less restrictive conditions as he progressed through each phase of the program. Also of importance, the record shows that Rosario was receiving at least some PRC reviews and that he had the ability to file grievances. (*See* ECF Nos. 80-13, 80-15, 80-16.) Both of these processes gave him a forum to address any concerns related to his confinement in the

9

RHU.

Further, as to the subjective component of the Eighth Amendment test, courts must also consider whether officials "had a legitimate penological purpose" behind their conduct. *Ricks v. Shover*, 891 F.3d 468, 475 (3d Cir. 2018). Rosario was confined to the RHU following the March 24, 2020 incident during which he assaulted a guard. The undisputed record shows that he then assaulted another guard on July 9, 2021, resulting in his conviction in the Court of Common Pleas of Cumberland County. Although Rosario disagrees with the DOC's version of events on February 19, 2021, the record nonetheless shows that he received other additional misconducts for assault and fighting after his confinement in the RHU. (*See* ECF No. 80-6.) Several of his PRC reviews specifically state that the reason for his RRL placement is a "long assaultive history towards staff and inmates" or "unpredictable patterns of violence." (ECF No. 80-13 at 6, 15, 16.) The uncontroverted record therefore shows that Rosario was not transferred to the RHU or placed on the RRL randomly, but as a result of multiple violent episodes both before and after he was moved to restrictive housing.

Because the record does not establish that Rosario was subjected to a substantial risk of serious harm and that there was a legitimate penological purpose for his transfer to the RHU and RRL placement, Defendants are entitled to summary judgment in their favor as to Count I.

2. <u>Denial of adequate mental health care claim against Schneider and Benning</u>

Count II alleges that Schneider and Benning[9] were deliberately indifferent to Rosario's serious need for mental health care. Rosario contends that Schneider and Benning manipulated his

---

[9] The Amended Complaint identifies Schneider as a Licensed Psychology Manager and Benning as Director of the Bureau of Healthcare. (ECF No. 18 ¶¶ 9-10.)

psychiatric diagnoses to have him removed from the D Roster in order to "aid the agenda of others to initiate indefinite solitary confinement[.]" (ECF No. 18 ¶ 63.) Defendants argue primarily that summary judgment is proper because the record shows that Rosario had uninterrupted access to mental health treatment while on the RRL. (ECF No. 78 at 12-15.)

To succeed on an Eighth Amendment denial of medical care claim, the plaintiff must demonstrate: (1) that they had a serious medical need; and (2) that prison officials were deliberately indifferent to that need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *see Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

At the same time, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse*, 182 F.3d at 197. "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see also Kennedy v. S.C.I. Rockview Emps.*, 2010 WL 4853959, at *4 (M.D. Pa. Nov. 22, 2010) (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)) ("[C]ourts give prison medical personnel wide latitude in the diagnosis and treatment of inmates [and] should 'disavow any attempt to second guess the propriety or adequacy of a particular course

of treatment . . . which remains a question of sound professional judgment.'"). An inmate's disagreement with the nature of the medical treatment they receive is therefore not enough to establish deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Evidence in the summary judgment record clearly demonstrates that Rosario has a history of mental illness and that he has regularly required psychiatric care throughout his incarceration. (*See, e.g.*, ECF No. 100-4 at 2, 4) (showing schizophrenia diagnoses in both 2018 and 2020). Defendants' argument that Rosario failed to establish that he had a serious medical need is therefore unpersuasive.

In support of his claim, Rosario also submitted a signed declaration that states, in relevant part:

> The RHU has at times felt so overwhelming that I continued to hear voices, attempt suicide on several occassions [sic] and committed self harm [sic]. Some times I felt powerless and as if I was being controlled by the voices in my head. When I explained this to psych staff in the PADOC I was disregarded and even encouraged to harm myself on occassion [sic].

(ECF No. 100-3.) The attached medical records, however, show that he was evaluated by psychology at least ten times from February 5, 2020 to September 15, 2021. (*See* ECF No. 100-4.) He also admitted that a psychological services specialist is generally available for immediate access within his housing unit and that he can request a meeting with medical or mental health services at any time. (ECF Nos. 79, 104 ¶¶ 148-49.) He further acknowledged having had at least some of the 30-day psychology contacts required for all RRL inmates and that there had been past instances where he had been offered contact with psychology but declined to be seen. (ECF Nos. 79, 104 ¶¶ 151-53.)

The summary judgment record therefore does not support Rosario's claim that he was denied access to mental health care. While Rosario may disagree with the level of care that he has received, or even dispute the specific diagnoses given to him by DOC physicians, the record shows that his confinement in the RHU and his RRL status have not prevented him from receiving mental health treatment. *See Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000) ("[C]ourts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care.").

Because record evidence shows that Rosario has access to mental health care and has consistently received treatment, Schneider and Benning are entitled to summary judgment in their favor.

### B. Fourteenth Amendment claim

Count III alleges that Defendants violated Rosario's Fourteenth Amendment due process rights. He alleges that Schneider and Benning created the circumstances which would result in the denial of the same level of care as others; Defendants collectively initiated his RRL status and continued it without affording him opportunity for meaningful review or appeal; and that Defendants Wetzel, Harry, Ferguson, and Bickle failed to revise the RRL policy so as to allow RRL inmates access to rehabilitative programming. (ECF No. 18 ¶¶ 65-69.)

The analysis for a procedural due process claim begins with determining whether the liberty interest asserted is protected under the Fourteenth Amendment. *Montanez v. Sec'y Dep't Corr.*, 773 F.3d 472, 482-83 (3d Cir. 2014). If the asserted interest is protected, the court must determine what process is required to protect it. If the interest is not protected, no process is necessary. *Newman v. Beard*, 617 F.3d 775, 783 (3d Cir. 2010).

Prisoners do not enjoy the same liberty interests as non-incarcerated citizens. *See Sandin v. Conner*, 515 U.S. 472, 485 (1995). "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.,* 433 U.S. 119, 125 (1977)). "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017) (emphasis in *Williams*) (quoting *Griffin*, 112 F.3d at 708). "The more restrictive the conditions are, the shorter the period of confinement is tolerated. Conversely, the less restrictive, the longer the period is before it becomes a hardship." *Wayne v. Clark*, 2022 U.S. Dist. LEXIS 232931, at *18 (W.D. Pa. Dec. 29, 2022).

Third Circuit precedent is clear, however, that "confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002). Placement on the RRL alone similarly will not give rise to a liberty interest. *See Huertas v. Sec'y Pa. Dep't of Corr.*, 533 F. App'x 64, 67 n.6 (3d Cir. 2013) ("To the extent that Huertas' due process claim is based on his placement on the RRL, a list of inmates who may only be released from administrative custody upon prior approval of the Secretary of Corrections, we agree with the District Court that this does not implicate a constitutionally protected due process right."); *see also Bowen*, 248 F. App'x at 304; *Washington-El v. Beard*, 2013 WL 1314528, at *9 (W.D. Pa. Feb. 26, 2013), *report and recommendation adopted*, 2013 WL 1314521 (W.D. Pa. Mar. 28, 2013), *aff'd*, 562 F. App'x 61 (3d Cir. 2014).

Thus, to the extent Rosario seeks to challenge his initial placement on the RRL, this claim is not viable. But Rosario also challenges his alleged lack of meaningful review and opportunity to appeal his RRL status. No bright line defines where the duration of an inmate's segregation becomes atypical. *Williams*, 848 F.3d 549 at 561-62; *see Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000) (holding eight years in prolonged, indefinite solitary confinement implicated a liberty interest); *Griffin*, 112 F.3d at 708 (holding fifteen months in disciplinary custody did not implicate due process concerns). In his Amended Complaint, Rosario alleges that he was on the RRL for over 26 months and in the RHU on AC status for a total of 41 months. It is possible that confinement in prolonged isolation for this length of time may be considered atypical.

On the issue of signficant hardship, a court must consider the nature of the prison conditions in relation to the ordinary incidents of prison life, including "[a]ccess to open air activities without strip searches; regular access to windows and natural light; daily access to showers; and the right to more frequent visits where contact is permitted." *Williams*, 848 F.3d at 563. The court may also examine access to group religious services, jobs, and vocational programs, group sports, and telephone calls; human contact with individuals other than prison staff; the ability to qualify for parole; the hours a day confined to the cell; and whether the inmate eats meals alone. *Id.* at 562-664. In *Williams*, a signficant hardship was found to exist where an inmate was confined to his cell for twenty-two to twenty-four hours a day indefinitely, ate his meals alone in his cell, was "placed inside a small locked cage during much of the limited time he was allowed to leave his cell and . . . was subjected to invasive strip searches each time he left his cell for exercise." *Id*. at 563.

While Rosario alleges that he endured restrictive conditions, his conditions of confinement differ from those discussed in *Williams*. As discussed above, the record demonstrates that Rosario

15

was seen by counselors and psychiatry, and that he was permitted to make weekly phone calls and have monthly video visits with loved ones, was eligible to participate in group activities and have out-of-cell time, including meals with other inmates, due to his participation in the IMU program. *See supra* Section IV.A.1.

But even assuming that Rosario did suffer a deprivation of his constitutionally protected liberty interests by virtue of the length of time he had been held in the RHU, "[i]t is well settled in Pennsylvania that periodic review of inmates indefinitely confined in administrative confinement comports with due process requirements." *Washington-El*, 2013 WL 1314528, at *8; *see Shoats*, 213 F.3d at 140 (holding periodic review of inmates indefinitely confined to AC meets minimum due process requirements). Rosario contends that he did not receive any meaningful review of his RRL status until 2024. (ECF No. 100 at 13.) Completed PRC review forms supplied by Defendants, however, state that Rosario was present for at least five review sessions and refused to attend at least three more during the period of time from July 7, 2021 to January 17, 2024. (*See* ECF No. 80-13.) Although Rosario maintains that these reviews were perfunctory, he cites no factual support for this contention.

Thus, because Rosario's due process rights were not violated, Defendants' motion for summary judgment will be granted as to Count III.[10]

---

[10] Defendants argue alternatively that they are entitled to summary judgment as to Rosario's Eighth and Fourteenth Amendment claims based on lack of personal involvement and qualified immunity. The Court need not reach these arguments. As to Defendants' contention that "[t]he Complaint does not allege any affirmative role Defendant Benning may have played in the alleged constitutional violation" (ECF No. 78 at 6), however, the Court notes that this argument appears to be based on a prior version of the complaint rather than the operative Amended Complaint (ECF No. 18).

### C. ADA claim

Finally, Count IV alleges that Defendants violated Title II of the ADA. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To maintain a claim, a plaintiff must show "that he is a qualified individual with a disability, who was precluded from participating in a program, service, or activity, or otherwise was subject to discrimination, by reason of his disability." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019).

The United States Supreme Court has held that state prisons qualify as "public entities" under the ADA. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208 (1998). While the Third Circuit has yet to address individual liability under Title II of the ADA in a precedential opinion, it has cited with approval "decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA." *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002). *See, e.g.*, *Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 938, 942 (3d Cir. 2019) ("[Plaintiff's] claims for individual damages liability under Title II of the ADA fail for the simple reason that there is no such liability."); *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163 (3d Cir. 2015) ("Title II of the ADA does not provide for suits against state officers in their individual capacities."). Rosario names Defendants in both their individual and official capacities. Because there is no individual cause of action under the ADA, all individual claims against Defendants will be dismissed.

The Third Circuit has recognized, however, that "federal ADA claims for prospective injunctive relief against state officials" in their official capacities are cognizable. *Koslow v. Pennsylvania*, 302 F.3d 161, 179 (3d Cir. 2002). Although the Amended Complaint does indeed

17

seek injunctive relief, Rosario has nonetheless failed to state a claim of disability discrimination. Rosario's claims are premised on his allegation that Defendants sought to "discriminatorily punish him with indefinite solitary confinement, which they are aware will more than likely exacerbate his mental illness causing further penalizations for the mental health related symptoms he displays." (ECF No. 18 ¶ 71.) He again alleges that Defendants manipulated his diagnosis and claims that he was denied proper medication and access to the same mental health care and rehabilitative programming as other inmates, both mentally ill and "general population." (*Id.* ¶¶ 72-73.)

But, as discussed above, Defendants had a legitimate penological purpose for transferring Rosario to the RHU and placing him on the RRL. *See supra* Section IV.A.1. And once again, Rosario continued to have access to adequate mental healthcare even after being placed on the RRL, regardless of whether it was the exact type of care that he desired. *See supra* Section IV.A.2. Nothing in the record suggests that Rosario was excluded from a particular program or service, or was otherwise discriminated against, *because of* a disability. *See Holden v. Wetzel*, 2021 WL 1090638, at *4 (W.D. Pa. Apr. 20, 2020) (holding plaintiff's conclusory assertions that defendants engaged in disability-related discrimination by subjecting him to the conditions of the RHU and/or subjecting him to a sham investigation and/or failing to transfer him to a different prison did not state a claim under the ADA); *Rashad v. Doughty*, 4 F. App'x 558, 560 (10th Cir. 2001) ("[F]ailure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation.").

Simply put, even when viewed in the light most favorable to Rosario as the nonmoving party, the summary judgment record does not support his conclusory allegations that Defendants

engaged in unlawful discrimination. For these reasons, Defendants are entitled to summary judgment in their favor as to Count IV.

## V. Conclusion

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 77) will be granted.

Appropriate orders to follow.

Dated:  March 10, 2025                           /s/ Patricia L. Dodge
                                                 PATRICIA L. DODGE
                                                 UNITED STATES MAGISTRATE JUDGE